## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ANGELA DAVENPORT       )
                          )
                          )
         **Plaintiff,**      )   **CASE NO. 1:13-CV-2358-TWT-**
   **vs.**                 )   **JSA**
                          )
**APOLLO MD/INDEPENDENT** )
**PHYICIAN GROUP, et al.,**   )
         **Defendant.**    )
                          )
                          )

---

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** Angela Davenport (hereinafter "Plaintiff"), Plaintiff in the above-styled case and files her second amended complaint showing the court the following:

### SUMMARY OF ACTION

### 1.

This is an action for damages and jury trial against Defendant Apollo MD/Independent Physicians Group (hereinafter "Defendant") arising under the following statutes: (1) Title VII of the Civil Rights Act of 1964, as amended; (2) Retaliation; and (3) Constructive Discharge.

## JURISDICTION

### 2.

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 in that it involves a Federal question arising under the laws of the United States.

## PARTIES

### 3.

Defendant is a domestic corporation formed under the laws of Georgia. Defendant's principal place of business is located at 565 New Northside Drive, Suite 320 Atlanta, Georgia 30328. Defendant's registered agent is CT Corporation. CT Corporation is located at 2180 Satellite Blvd. Suite 400, Duluth, Georgia 30097. Ms. Linda Banks works for CT Corporation. Defendant has more than 15 employees working at its principal place of business.

### 4.

Defendant also does business in the state of Georgia under the name of ApolloMD Business Services, LLC. Under this name, Defendant's principal place of business is located at 565 New Northside Drive, Suite 320 Atlanta, Georgia 30328. Defendant's registered agent is CT Corporation. CT

Corporation is located at 2180 Satellite Blvd. Suite 400, Duluth, Georgia 30097. . Ms. Linda Banks works for CT Corporation. Defendant has more than 15 employees working at its principal place of business under this name.

5.

Defendant also does business in the state of Georgia under the name of ApolloMD Physician Partners, Inc. Under this name, Defendant's principal place of business is located at 565 New Northside Drive, Suite 320 Atlanta, Georgia 30328. Defendant's registered agent is CT Corporation. CT Corporation is located at 2180 Satellite Blvd. Suite 400, Duluth, Georgia 30097. . Ms. Linda Banks works for CT Corporation. Defendant has more than 15 employees working at its principal place of business under this name.

6.

Defendant also does business in the state of Georgia under the name of ApolloMD Physician Services Al, LLC. Under this name, Defendant's principal place of business is located at 565 New Northside Drive, Suite 320 Atlanta, Georgia 30328. Defendant's registered agent is CT Corporation. CT Corporation is located at 2180 Satellite Blvd. Suite 400, Duluth, Georgia

30097. . Ms. Linda Banks works for CT Corporation. Defendant has more than 15 employees working at its principal place of business under this name.

7.

Defendant also does business in the state of Georgia under the name of ApolloMD Physician Services GA, LLC. Under this name, Defendant's principal place of business is located at 565 New Northside Drive, Suite 320 Atlanta, Georgia 30328. Defendant's registered agent is CT Corporation. CT Corporation is located at 2180 Satellite Blvd. Suite 400, Duluth, Georgia 30097. . Ms. Linda Banks works for CT Corporation. Defendant has more than 15 employees working at its principal place of business under this name.

8.

Defendant also does business in the state of Georgia under the name of ApolloMD Physician Services NC, LLC. Under this name, Defendant's principal place of business is located at 565 New Northside Drive, Suite 320 Atlanta, Georgia 30328. Defendant's registered agent is CT Corporation. CT Corporation is located at 2180 Satellite Blvd. Suite 400, Duluth, Georgia 30097. . Ms. Linda Banks works for CT Corporation. Defendant has more

than 15 employees working at its principal place of business under this name.

9.

Defendant also does business in the state of Georgia under the name of ApolloMD Inc. Under this name, Defendant's principal place of business is located at 565 New Northside Drive, Suite 320 Atlanta, Georgia 30328. Defendant's registered agent is CT Corporation. CT Corporation is located at 2180 Satellite Blvd. Suite 400, Duluth, Georgia 30097. . Ms. Linda Banks works for CT Corporation. Defendant has more than 15 employees working at its principal place of business under this name.

10.

Ms. Angela Davenport is an African-American woman. Ms. Davenport worked for Defendant from March 22, 2010 through March 21, 2012.

11.

Ms. Davenport filed a claim with the EEOC within 180 days of the facts outlines below. Ms. Davenport received a notice of suit rights on April 17, 2013.

## FACTS

### 12.

I was hired and after 7 months was moved into a new role. I was sexually harassed by a coworker, filed a complaint with supervisor and it was ignored. I later filed a complaint with the Human Resource (HR) department and shortly after I was moved back into the previous position and advised that my job was on the line even though I had not been given prior warning that this was an issue. I was the only person who was moved without being asked or asking to move. I was not offered any training to improve my job performance if there was an issue even though I had successfully performed in this role for almost a year in a half without incident. I honestly feel that I was penalized because I complained.

### 13.

I began working for ApolloMD in their Credentialing Department as a Financial Credentialing Specialist on March 22, 2010 under Lisa Murray, the Credentialing Director. Lisa was my immediate supervisor. On or around October 20, 2010, another employee who functioned as the company's physician licensing specialist was terminated. I was asked if I would be interested in the job by the department manager, Kim Larson and I said yes.

The director offered the role to everyone in the department so that the employees who were department veterans had the first chance to move into the role if they were interested, as I was the last person hired in the department. No one else wanted the role and so I was moved into the physician licensing role.

14.

I had no experience in physician licensing. The only exposure that I had to the physician licensing process was gained by assisting the employee that previously functioned in this role. She and I sat in the same room when she was employed in this role and I would often assist her by reviewing and interpreting some of the information or by helping her to obtain certain information relevant to this role. This information included obtaining contact information for medical schools, medical training programs, hospitals, etc relevant to getting a specific physician licensed. In the time that I worked in this role I managed to get over 40 licenses in this role. From October 2010 to sometime between April 2011 and June 2011, I functioned as the physician licensing specialist while working as the financial credentialing specialist, helping one co-worker and actually performing the role of another until they hired an additional employee to function as the financial credentialing

specialist. Eventually she added a person to work part-time (Terri Seals) and a then an additional full time person (Paula Weathers) to help me in physician licensing. The part time person started in March or April 2011 and the full time person in mid January 2012. I will discuss this further at another point in this explanation.

15.

While working in this role I was sexually harassed by Quentin Stinson, a co-worker, starting in or around late August 2011. He would say things that included "Angela, nice stripper shoes" or "Angela, today you are dressed like the office whore." There was one instance where he called my desk and asked to me come over to his desk to look at something. This was not uncommon, since he was working in a role that I previously held and he would do this if he had a question about something (work related) that I may have previously worked on. In this instance, I walked over to his desk to see my previous home on the computer screen. I said "what is that" while trying to remain calm, as I already knew what it was. He then clicks the mouse and pulls up my current home and he says "I know that this is your house because that is your husband's truck". On the screen appeared my current house with my husband's truck on the screen. He knew what my husband

drove because my husband had come to my job in his truck to pick me up on multiple instances. Quentin advised that he used the webpage Spokeo to look up information about me because he had heard other people in the department talk about the web address. I said please do not look up anything related to me on the internet and anywhere else. This made me uncomfortable. I repeatedly asked this individual to stop harassing me and at one point I made this request in front of another co-worker, Keisha East and Quentin at that time admitted saying these things to me.

16.

He said that his wife told him that he should not be saying some of these things to me, as they were inappropriate, but he continued to say these things. I even emailed Quentin and requested that he stop saying these things to me. It didn't stop. I spoke with my immediate supervisor, Lisa Murray, the department director, even providing emailed proof of me asking the offender to stop, on 10/13/2011 and him replying to me stating that he thought that I needed to loosen up and that I should be more like Keisha East, another co-worker of ours. When I showed this to my supervisor, Lisa Murray, she advised that maybe he (Quentin-the offender) had a crush on me. She further advised that if she were my size and had my shape that she would be happy

be. I told her that I wanted the harassment to stop. She said well what do you want me to do? I said I want it to stop. I am not saying fire anyone, but Lisa, I should be able to come to work and not be harassed. As we continued to speak she indicated that she did not see him as the type that would do this. I was in tears at this point. She said that she would have to change the tone the department because she felt that she had made it too comfortable and that people may have felt that this type of behavior was acceptable because she was guilty of it as well. I walked away thinking that this would change.

17.

On that same afternoon I was advised that I was receiving a $3000 increase in my pay. I had met with my COO, Roger Murray, (no relation to Lisa Murray, from my understanding) previously regarding a raise, there was no review, I needed to .e able to convince him that I deserved a raise. He was angry about something else and so my meeting did not go well. I was told that he would get with my supervisor and let me know. This meeting had taken place about 2 months prior to this date and I had not heard anything about it since that date, but coincidently, Lisa Murray asked to speak with me in the hall outside of my office on October 13, 2011 at 3:30 and she advised me that I was getting a $3000 raise. I was advised that it had

been approved by Roger Murray, the COO on that same day (10/13/2011) and that it was being forwarded to Chris Krubert, the company President, for his signature. She further advised that the paperwork was currently pending Chris Krubert's signature, but upon him signing off on the increase that the increase would be effective November 1, 2011 and that the increase would not start to appear until my December 1, 2010 check. This would increase my salary from $35,000 to $38,000. Absolutely nothing had changed about the way that I performed my job or the functions that I was responsible for. I was not expecting this and I was quite surprised when told of this, especially when I knew that I had spoken with Lisa Murray that same morning about the harassment and she did not indicate that this was going to take place. Honestly, I felt a little uncomfortable about the raise because it felt like I only received it because I had spoken about the harassment earlier that day.

18.

I thought that there would be changes but even after this point there were instances where we had a male intern in the department and he and the director would freely discuss him getting girls at his college drunk and having sex with them. At the department Thanksgivings dinner the director and several other employees freely discussed sex with a MILF. They then

explained what a MILF (Mother I'd Like To Fuck) was to employees who did not know what it was. There were other instances where department employees were walking around with a picture of someone's penis on a cell phone and showing it to people. They skipped me because they knew that I was not interested in seeing it. There were instances where the director advised us that she was going home to watch a movie called The One Eyed Monster. I tried to ignore the comments as I knew what this refereed to. Then on Monday she came back to work and described the movie and the star of the movie which the director described as a possessed penis from another planet.

19.

I was uncomfortable and did not engage in the conversation by choice, but this is just an example of the environment that I was forced to work in. It is hard to expect everyone else to behave in a certain manner when you have leadership that makes it not only acceptable, but completely appropriate to behave in this manner. After my talk with Lisa on October 13, 2011, I honestly thought that the environment would change and that she would reinforce an environment that limited this type of behavior, but instead of this it was a free for all to discuss whatever you wanted to,

whenever you wanted to, with whomever you wanted to and however you wanted to. I was not seeking to censor anyone but I was hoping that I could go to work and there be some limits on this type of behavior.

20.

The harassment did not stop. The offender advised me that he needed to do this when no one else was present, which he did because to quote him, "It would be my word against his". The offender began t o say stuff when no one was present. My desk was located in a small office in the front of my department and everyone had to pass through my office in order to enter and exit our department and he would say stuff as he passed through my office if I was alone. I went to HR in late January or February 2012 (I am not sure of the exact date at this point). I met with Thea Dillinger, the HR Director. I provided copies of the emails that were exchanged between Quentin and me to her and I told her that I was still being harassed. I told her that I had spoken with my supervisor but the harassment was continuing. She asked why I didn't come to her and I told her that I thought that once I talked to Lisa that not only would it stop but that she would file it in HR. I thought that I was putting it on record by going to my supervisor. Thea advised that had I come to HR when I initially got the email that I would not have had a

problem but since I did not have any evidence that it was still happening that there was nothing that she could do but speak to Quentin. She did advise that she knew that he had received training on sexual harassment in the workplace via a video that had been previously shown to him when he worked in another department. She advised that she would speak with Quentin the next day.

21.

The next day Thea asked to meet with me and at that time she advised me that she did speak with Quentin and that he denied doing anything and that he and I needed to keep some distance between us for a while. She did not discuss whether or not she had spoke to him about the emails that I had given to her. I could not believe what I was hearing. I did not have to interact with Quentin so I made sure to stay completely away from him. I kept my headphones on when possible and I chose to never raise my head up to see who entered or exited the door in an attempt to avoid eye contact with him.

22.

At some point during February, after I met with the HR Director, my office mate, the part time licensing specialist, Terri Seals, were in our office.

Terri and I had shared an office since the middle of 2011. I was bent over getting files out of a file cabinet located in my office. The manager, Kim Larson, was passing through the office and as she passed she "whacked" me hard on my derriere. This was not just a brush up against me as she passed by me. This whack hurt and my bottom stung for a while after that. I stood up and asked her did she just whack me on my butt and she said "Yes" it was so big and it was right there in my face, I had to do it. Terri then asked her "Did you just hit her on her butt?" Kim laughed again and said "Yes, Her big ole butt was right there in my face". I was stunned. I said "Kim that is not acceptable." She then laughed and said what you are going to do, run to HR. She then said something to Terri but I was just dazed, I could not believe that management was comfortable doing this to me, especially after everything that had taken place prior to this incident. I felt violated and humiliated and I felt helpless.

23.

I did not go to HR because at this point I felt like I was being targeted because the exchanges between my supervisor and I had become strained and I felt like I just needed to find another job as soon as possible or this is the type of treatment that would continue to take place. Lisa was short and

stern when she spoke with me regarding anything and as a result I really tried to avoid interacting with her if I could. I also feared that I would be retaliated against. I had previously gone to HR and I had been basically told just to stay away from Quentin even though I had proof that he sexually harassed me. I also felt like Kim's joke about going to HR was to taunt me because as part of management, I felt that she was aware that I had gone to HR about Quentin. I felt completely helpless. I spent my evenings and weekends at home sending my resume out and completing job applications in the hopes of getting a job, any job, in order to get away from this environment. This manager had been with the company for approximately 7 years and had formed relationships with members of Executive Management and I honestly felt that I would be making myself a bigger target if I did anything short of leaving the company. I could not afford to quit but I was definitely seeking other employment at every opportunity that I could from applying online to networking.

24.

This job was stressing me out. There were mornings where I sat in the parking lot and cried because I felt helpless. My husband dropped me off at work one morning while he repaired my car and I could not even get out of

the car I was crying so hard. He asked if I wanted him to go in the office ad

address some of these issues, but I told him "No" I just needed to find

another job soon. This was starting to affect my marriage and my home life.

I rarely moved from my desk and I sat there fearing that I would be

retaliated against. I had been told by HR that I would not, but I felt like

things had changed after this all was brought to the HR department.

25.

At some point in February 2012, another employee left the company,

vacating a financial credentialer position. At that time, Paula Weathers, the

other full time physician licensing specialist advised that the role was not

what she thought that it would be and that she had asked to move back to

financial credentialing the financial credentialing position that had opened

up. Our department interviewed three people to fill the other full time

physician licensing specialist position that Paula Weathers was vacating

when she transitioned to the financial credentialer role that needed to be

filled. One of the individuals that interviewed for the physician licensing

position was offered the job. She was scheduled to start on March 19, 2012.

It was determined that Paula would hand over her active provider licensing

files to the newly hired physician licensing specialist and then going forward

I would work with part-time physician licensing specialist, Terry Seals and the newly hired physician licensing specialist, Charlene.

26.

During the week of March 12, 2012 at some time the director met with the financial credentialers and physician licensers to advise us that the culture of the company was changing. On either Tuesday, March 13, 2012 or Wednesday, March 14, 2012 the director had a meeting with my department to advise us that Quentin was terminated from the company for costing the company 3.5 million dollars in revenue. She advised that she would be interviewing and hiring for his position.

27.

On Friday, March 16, 2012, my director, Lisa Murray came to me and asked to speak with me a minute. She took me to the conference room and advised that my job was on the line and that in order to keep it I needed to be moved into Quentin's old position, the financial credentialing job that I initially held when I was hired in March of 2010. I was caught off guard. She advised that I was taking too long to get my job done. She further advised that this change was effective starting Monday, March 19, 2012. My director advised that she was hiring the other applicant that had been

interviewed because she was experienced. I was speechless as I had not been given a warning that there was a problem with my work ethic. I had been working as hard as possible to get my job done but had met obstacles because Paula was not full time even when she was fulltime, as she was helping the financial credentialers and I needed to pick up the slack when she could not get priority items completed. This was not my work though, this was Paula's so I was not sure why I was being moved back into a role that I had asked to move out of over a year earlier. Paula had been given the option to move from physician licensing to financial credentialing. I had been advised that I did not have an option.

28.

Weeks prior to this happening I had interviewed with a governmental payor organization and TRC (a staffing placement company). TRC interviewed me to work at a large medical group practice for a physician licensing specialist position, the role that I had performed at ApolloMD. The representatives at the large medical group practice were impressed with me after the first interview and were requesting that TRC schedule a follow up interview for me to meet with several of their Vice Presidents on March 19, 2012. When I got back from lunch I emailed Lisa and requested Monday,

March 19, 2012 and Tuesday, March 20, 2012 off. Tuesday I planned to take care of some person things. I was told that I could take Monday off and half a day Tuesday because I needed to come in and train my replacement on Tuesday. I went to my interview on Monday and I was told that they were interested and that I would be hearing something soon. I had advised the TRC reps and the large group practice reps that I would like to give ApolloMD two weeks notice if they offered me the position with their organization but that the company had a history of releasing the employees if they turned in their notice to quit so if they let me go early that I would be able to start sooner than the two weeks. I did not finish all of the items that I was working on Tuesday and so at 12:00 I contacted Lisa and I advised her that I would not be coming in on Tuesday afternoon, but that I would be in on Wednesday, March 21, 2012.

29.

When I returned to work on Wednesday, March 21, 2012, I arrived at 9:15. I went in and started replying to emails and voicemails. Lisa came to me and advised me that I needed to train the new girl that was hired to replace me this morning and then I needed to meet with her (Lisa) because Quentin had approximately 7-9 paper or bankers boxes of files that he had

not been accurately completing. The files were not in any order and they had just been put into those boxes and brought into my office. Lisa then told me that there was an urgent meeting that was scheduled by the Chief Financial Officer, Dave Ashfar and that I needed to go through all of Quentin's providers (Approximately 200 or more) to see what I needed to do to get the provider credentialed and to have a number assigned to each provider that was in question and that I needed to be able to provide answers on all of the applications that were outstanding. This was at 10:30 which meant that in less than 24 hours I would have to provide information that others would have been given weeks, and in some instances a month, to prepare and provide answers for. I felt deflated. I felt like I was being set up to fail again. I felt weak and I got sick to my stomach.

30.

Immediately after Lisa returned to her desk I noticed that I had received a voicemail on my cell phone. I went outside and checked the voicemail. It was the representative from TRC staffing and she wanted me to call her back. I returned her call and she advised that I had been offered the job. I advised that I would accept the job and that I would be turning in my notice immediately. I would be available two weeks from Wednesday,

March 21, 2012. When I returned to my desk I opened my email and saw that I had been bombarded with emails from Lisa that had sat in Quentin's inbox without being resolved and she was now stating that I needed to get immediate answers for these inquiries. Lisa also advised me that I needed to keep my daily worksheet current and update because it would be reviewed by the CFO and the COO. This was important and she understood that I had not done this as frequently when I was in this role over a year ago, but I needed to keep it current now. I reminded Lisa that I was doing the work at the time at that I had my own method for keeping up, since that was optional at the time. I also advised that I was performing three jobs at that time. She said she knows that and that at this time, I did not have an excuse as to why I was not keeping this worksheet updated. Lisa's tone, when she interacted with me, had really begun to change since the HR Director had spoken with her about the harassment complaints.

31.

She seemed irritated when she had to deal with me. I had previously limited my interactions with her as well. I called the new hire over to go over the active provider license files that I had. I gave the individual what I needed. I then resolved some outstanding items for some of my doctors that

I knew had been problematic as I did not want them to fall through the crack.

32.

I packed up my personal belongings and at this time I began to write my letter of resignation. I wrote the letter stating that my resignation was effective immediately. I printed three letters. One letter was for Lisa Murray. One letter was for Thea Dellinger, HR Director. The final letter was a copy for me. At 12:30 I went to the front desk and left a copy of the letter in a sealed envelope for Thea Dellinger with the receptionist. I had been advised that the HR reps were downstairs at a company sponsored Health Fair. I did not feel that it was appropriate to take this letter downstairs so I left it with the receptionist. I am not sure but I think that the main receptionist was at lunch as she was not at the front desk when I dropped off the letter for HR. This is relevant because it speaks to the fact that I left later than the supervisor suggests.

33.

I immediately went back to my desk and I got the second letter and I walked over to my supervisor and I tried to hand it to her along with my front door key, the key to the file cabinet and my badge to enter the building

after hours and on weekends. My intention was to hand her the letter and the other items and then leave the building. I advised her that my resignation was effective immediately and that I could not do this anymore. She initially thought that I was kidding ant asked me was I joking. I told her "No". She asked was I giving her two weeks and I told her again, rullt this was effective immediately. She told me that I had to give her two weeks. I told her "No" I could not do that. She began to start yelling at me that I owed her two weeks and that I was being unprofessional. She then advised me that if I did this that she would never give me a reference. I replied that I understood. She still would not take the items from me. She continued to get louder and eventually began to yell at me in front of the other employees and she advised that she was not happy, in fact that she was angry at this moment.

34.

Lisa still would not take the items from my hand even after I had repeatedly moved them towards her. I said "Lisa, I understand what you are saying, but I am not going to argue with you about this. My resignation is effectively immediately." At this point, I placed the items that I held in my hand on her desk. She began to move towards me stating that "since I was doing this that she needed me to leave immediately." I explained that "that

was fine" and "that my purse and bag were on my desk and chair and I just needed to pick them up and walk out." I remained calm the entire time even though she continued to yell at me. She rose from her desk and followed me to my office. I picked up my purse and bag from my desk and chair. She stood there and watched as I walked out of the door.

35.

After I left I met my coworker for lunch at Cumberland Mall. We had previously planned to go together, which we did frequently and had agreed to do today, prior to me knowing that that day was my last day. At this time I explained that I needed to leave the company premises immediately because I did not want problems because I was in the parking lot waiting on her. She advised that Lisa immediately held a short meeting advising the remaining employees that I quit and that she was not giving me a reference and that if any of them did that they better hope that she never finds out about it or they would have problems. I do not even feel that I should continue to list this job on my resume or any job application going forward, as I am concerned about what might be said if a potential employer ever calls to verify my employment history. I have heard her give feedback when other employees that she was unhappy with listed this job. She was very harsh and gave

information relative to previous employees that went beyond the from and through dates of the employment. I have heard her have exchanges with a previous employee's landlord at which time she discussed an unverified drug addiction, the previous employee's relationships, etc.

36.

So I fear listing this job on my resume. I have a job now, but I am working very hard on completing my Doctorate in Business Psychology. Eventually, I will want to transition into my field and focus on training and development in a corporate setting. I fear that this job may be the black eye on my resume that haunts me simply because I wanted and asked to be treated with respect.

37.

On Friday, March 23, 2012 I was at home and I received a FedEx packet from ApolloMD which included a Separation Notice and an Independent Physician Resources Final Compensation Action document. The Final Compensation Action Document noted that there would be a Final Pay Deduction amount of 6 hours because I had only worked 2 hours on 03/21/2012. This is incorrect because I worked from 9:15 to 12:25. The document also reflected that I owed the company -34 hours of PTO. I

believe that this is incorrect as well. The document also noted that my final

check date would be 04/15/2012 for pay period 03/16/2012 to 03/31/2012. I

feel that even after leaving the company I am being taken advantage of and

mistreated by this organization.

38.

This entire process has been extremely stressful to me. I have been

harassed, demoted because I complained and then humiliated because I

decided to leave the company. The stress consumed my entire life. I cried all

of the time. I had panic attacks and/my self-esteem was extremely low. I

have managed to obtain my Bachelor of Science in Communication and my

Master of Science in Communication. I am currently pursuing my Doctorate

of Psychology yet this experience left me feeling like I was seen as a sex

object or like I was incompetent. I felt degraded and I felt helpless. I could

not understand why I was and had been treated this way when all I had done

was do my job. I had brought structure to the physician licensing role.

39.

I established an intern program in the credentialing department. This

was the first time that this department ever used interns. This had not been

considered in the past. I sought permission from my director and the COO

and upon obtaining it I began contacting and working with schools in the area that offered medical front office programs. I finally met with a representative from MedTech and our department contracted to be an intern site for Medtech students in their Front Office program. Once the program was established in our department I as responsible for coordinating the interns and the assignments that they were working on to ensure that the interns were used effectively, as well as to ensure that the interns gained something from the experience and were presented with opportunities to do more than file. The program was used for about 6-8 months but we had to table it until I had time to locate another school because we were less than pleased with the quality of the interns that we were receiving, but Lisa was adamant that she wanted me to contact another school to restart the program and she did not want anyone else to be responsible for this but me. I have repeatedly proven that I have the company's best interest at heart but I feel that my being vocal about this issue superseded any other contribution that I have brought to ApolloMD. I am out of that organization, but I still feel violated by everything that I went through.

40.

I know that there may be additional information that I failed to include by accident but I have tried to include everything that I could think of when completing this explanation. I will try to provide additional information if I have omitted it.

41.

I did not understand the concerns surrounding the length of time that it took providers to get licensed since I held a monthly meeting with the recruiters, travel team and the my director to explain where the providers were in the process, to determine if priorities had changed and to remove providers that had been put on the list but now needed to be removed. There were instances where I submitted an application for a medical license and I requested the necessary items. During this time a travel recruiter called and was told that the license was processing and was told what was missing. These items had already been requested by me so when she called it appeared that she had taken an action because she reported the information that she was provided by the medical board. She was only able to do this because I had done my job.

42.

This was not the result of anything that she had done. So even in those instances, it was not because I failed to do my job. It was because the travel recruiter made a call and was provided an updated on a license that I was actively working on. I even a created a flow chart, at my home on my personal time, using my computer, to be able to identify this process so that I was able to ensure that I was doing everything that I needed to do in a timely manner. Eventually, I shared this document to be able to help to explain the entire process that is involved so that everyone knew how long this process took, hoping that the recruiters would have a more clearer understanding of everything that is involved in the licensing process. I always kept my supervisor informed as to what problems would arise if there was a delay in the process.

43.

In this role I was responsible for getting physician's state medical license, when requested. I would receive a request from the recruiters, the executives, and my supervisor and in some instances, the doctors themselves. This process took an average of 3-4 months to complete. Some applications may take longer.

## SEXUAL HARASSMENT
## Count I.

### 44.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 43 as if fully stated herein.

### 45.

Quentin Stinson would make sexually harass plaintiff about 8 times per work. In one year, Quentin has sexually harassed Plaintiff about 50 times. Because of the sexual harassment, Plaintiff feared being in the department alone with Quentin. Quentin told her that he had to say stuff to her when no one else was around. Quentin told Plaintiff that it would be just his word against hers.

### 46.

Because of the sexual harassment, Plaintiff felt uncomfortable walking in the department and limited herself to her desk as much as possible for fear of running into Quentin. Plaintiff only printed when she knew Quentin was out of the office for lunch or some other reason. Other times, Plaintiff would ask her coworkers to get items that she printed off and deliver them to her.

47

Plaintiff did not want to go to work because of the sexual harassment from Quentin. Plaintiff would sit in the parking lot and cry most mornings prior to going into the office. One morning when her husband was dropping her off, Plaintiff cried hysterically to the point her husband wanted to go into the office and speak with Quentin. Plaintiff stopped her husband because she did not want him to get arrested. Plaintiff took great efforts to go to lunch and breaks at later times to avoid running into Quentin.

48.

The sexual harassment Plaintiff experienced from Quentin constitute an actionable violation of Title VII of the Civil Rights Act of 1964, as amended.

49.

As a result to the sexual harassment, Plaintiff is entitled to damages-general, compensatory, liquidated, and punitive – in an amount to be proven at trial and awarded according to the enlightened conscience of a jury.

## RETALIATION
## Count II.

### 50.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 43 as if fully stated herein.

### 51.

Plaintiff reported the sexual harassment to upper management. Upper management started harassing Plaintiff because she reported the sexual harassment.

### 52.

The harassment Plaintiff experienced constitutes an actionable violation of Title VII of the Civil Rights Act of 1964, as amended.

### 53.

As a result to the harassment, Plaintiff is entitled to damages- general, compensatory, liquidated, and punitive – in an amount to be proven at trial and awarded according to the enlightened conscience of a jury.

## CONSTRUCTIVE DISCHARGE
## COUNT III

### 54.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 43 as if fully stated herein.

### 55.

Plaintiff could not take any more harassment at work. No reasonable person in Plaintiff's position could take the harassment. Plaintiff left the company because of harassment. Defendant is liable for constructive discharge.

### 56.

As a result to the harassment, Plaintiff is entitled to damages- general, compensatory, liquidated, and punitive – in an amount to be proven at trial and awarded according to the enlightened conscience of a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays as follows:

1. that Summons issue and Defendants be served as by law provided;

2. that Plaintiff be awarded judgment in her favor with respect to all contentions in her complaint;

3. that Plaintiff be awarded actual and liquidated damages as proven at trial;

4. that Plaintiff be awarded nominal damages in an amount to be determined by the enlightened conscience of an impartial jury;

5. that Plaintiff be awarded compensatory damages for mental and emotional suffering in an amount to be determined by the enlightened conscience of an impartial jury;

6. that Plaintiff be awarded back pay;

7. that Plaintiff be reinstated to her employment position;

8. that Plaintiff be awarded front pay if reinstatement is not possible;

9. that Plaintiff be awarded punitive damages in an amount to be determined by a jury at trial to be sufficient to prevent such conduct as alleged herein from occurring in the future and commensurate with the harm done to Plaintiff;

10. that Plaintiff be awarded reasonable attorney's fees and expenses of

   litigation;

11. that all issues triable by jury be tried by a jury;

12. that all cost of this action be taxed to Defendant; and

13. for such other and further relief as unto this Court may seem just and

   equitable in the premises.


   Respectfully submitted this Tuesday, December 16, 2014

                                            s/ Michael O. Mondy
                                            Michael O. Mondy, Esq.
                                            Georgia Bar No. 897950
                                            Attorney for Plaintiff

**MICHAEL O. MONDY, P.C.**
925B Peachtree Street NE #329
Atlanta, Georgia 30309
Office: 404.492.9568
Facsimile: 404.492.7074
mondy@mondypc.com